PATRICIA C. SCHINE, Appellant-Respondent, v. C. RICHARD SCHINE, Respondent-Appellant.

First Department, April 13, 1971.

*Hyman Krugman* for appellant-respondent.

*Richard H. Wels* of counsel (*Stephen J. Schaeffer* with him on the brief; *Sulzberger, Wels & Marcus,* attorneys), for respondent-appellant.

McGIVERN, J. The parties were married in September, 1960, at a sumptuous wedding. She was quite young, not more than 19. Both also, it would seem, were spoiled and undisciplined. Previously, he had had a psychiatric involvement, and was so treated periodically throughout the marriage. Yet, the marriage, blessed by two children, rocked along, marked by an expansive life-style, far beyond his overt income. Marked also by not infrequent skirmishes, if not assaults, by him. Faults of immaturity and of extravagance she had aplenty. Yet, in addition to his share of tantrums, he had some disenchanting idiosyncracies: like going to bed with a urinal, garbed in a sweat suit, and cowled like a monk, to boot. He also, it seems, had a penchant for firearms; at one period he experienced " daynight " reversals, and at another, attempted suicide. Not altogether an easy man to live with, it might appear.

Come the summer of 1966, and he, for business reasons, he claims, was, for the most part, living unluxuriously in New York City, she in Great Neck, the marital abode, a 16-room house, with the children. It also seems he expected her to join him, connubially, in New York, every Friday evening, then she to return to Great Neck alone. But on August 12, 1966, she refused to stay, insisting on returning to the children, at that time ill; and one of whom required hospitalization. She offered to remain if she could arise early in the morning so she could take the oldest boy to the hospital. But that he did not like.

It would disturb his rest. So the twain parted, his final words: "I'll see you in court".

True to his purpose, he invited her to New York a few days later, to hold parley with the lawyer he had retained for divorce purposes. As she said: "because he had been begging me for a divorce for many months before that".

Meanwhile, or about that time, back at Great Neck, a housekeeper had lost a key to the front door. To quote her exactly: "Yes, I losted my key". And not unnaturally, and with commonsense caution, she (the wife) changed the lock to that door, as a protective measure. After all, she was living alone there in the marital abode, with the children. He was, certainly most of the time, living separately in the city. But on September 3, 1966, after sojourning in Boca Raton, the scene of yet another residence, and putting the family possessions, including the wedding gifts, in storage, anticipating legal strife, he returned to the Great Neck manse, which he had rarely visited that summer. Although his key did not fit the lock, he was readily admitted. Words followed. In time, he removed his personal possessions.

On this foundation, the court has granted a divorce to the husband on the sole grounds of her culpable abandonment, cutting off the wife without a penny's alimony. We do not agree. To the contrary, we find the determination lacking in factual foundation and insupportable as a matter of law. (*Matter of Lapenna,* 16 A D 2d 655, app. dsmd. 12 N Y 2d 671; *Matter of Maiden,* 284 N. Y. 429; see, also, *Diemer* v. *Diemer,* 8 N Y 2d 206, 210.)

If there was any "abandonment", it was the other way around. He was the one who left with the Parthian shot: "I'll see you in court". At that time, he was not actually living with her anyway, favoring separateness in New York to the marital abode, with Great Neck 15 miles away. And he never did return, neither that summer nor thereafter. But he did, previous thereto, and long before he discovered the changed lock (Sept. 3, 1966), consult purposefully with an attorney, divorce in mind.

In sum, we cannot reconcile the finding of abandonment against her with any of the classical notions of what constitutes abandonment by a guilty spouse. See, *Matter of Lapenna* (*supra,* p. 656): "Abandonment by a spouse is a voluntary departure or a living apart, without intention of returning, that is unjustified and without the consent of the other spouse, the separation being obstinate and hardened and one that would

have supported a judgment of separation (*Matter of Maiden,* 284 N. Y. 429; *Mirizio* v. *Mirizio,* 248 N. Y. 175; *Bohmert* v. *Bohmert,* 241 N. Y. 446; *Matter of Mead,* 281 App. Div. 943; *Matter of Christesen,* 277 App. Div. 893; *Matter of Buczek,* 80 N. Y. S. 2d 254; *Matter of Weinberg,* 75 N. Y. S. 2d 138; *Matter of Casey,* 51 N. Y. S. 2d 55) ''. And the burden was on him to establish her abandonment. (*Matter of Rechtschaffen,* 278 N. Y. 336, 338.)

In our view, the disposition under review represents an indiscriminate application of the '' dead marriage '' theory, a theory not posed by the instant pleadings, a relief not prayed for, and not supported by the evidence. The *Gleason* case (26 N Y 2d 28) should be regarded in the setting of its own facts, to wit, a pre-1966 separation decree and in its own context (Domestic Relations Law, § 170, subd. [5]) *Gleason* does not purport to hold out mere incompatibility as a ground for divorce, nor has the Legislature. Indeed, although the plaintiff wife commenced a suit in separation on March 24, 1967, it was not until August, 1968 that the notion of divorce for her abandonment came into the litigation by way of an amended answer to the husband's pleadings. The trial court recognized the inapplicability of the '' dead marriage '' theory, when at the conclusion of the trial, in colloquy he said such a characterization '' isn't going to enter into my decision ''. And he exhorted the parties sensibly to settle the case, implicitly recognizing that the defendant, as the mature scion of a wealthy family, had, as a husband, voluntarily assumed some financial obligations to the maiden he married 10 years ago, and the general support of whom he had undertaken.

Now, as a result of the trial court's decision, she is a guiltily divorced matron, in suburbia, with two children, seemingly ill-equipped, either by upbringing or by acquired skills, to earn her own living. And he is free of all obligations to her (Domestic Relations Law, § 236). (See *Brownstein* v. *Brownstein,* 25 A D 2d 205; *Sacks* v. *Sacks,* 26 A D 2d 575; *Kall* v. *Kall,* 35 A D 2d 943. For cases of like tenor: *Smith* v. *Smith,* 60 Misc 2d 692; *Newberger* v. *Newberger,* N. Y. L. J., Dec. 30, 1968, p. 14, col. 1 [Sup. Ct., N. Y. County].) The trial court, whose determination of abandonment by plaintiff, the dissent would affirm, by its own fact finding, '' ties its own hands ''. (See McKinney's Cons. Laws of N. Y., Book 14, Siegel Commentary, p. 137.)

As we view it, this husband has been erroneously permitted to seize upon the change of a single lock, done for good reason, as a pretext for his already formed '' irrevocable '', '' definite '',

" definitive " wish not to live with his wife. Contrariwise, we defer to and we agree with the trial court's finding that the plaintiff wife has not sustained her own burden of proof, vis-à-vis her own separation action for cruelty, by a fair preponderance of the credible evidence. (*Pearson* v. *Pearson*, 230 N. Y. 141; *Rios* v. *Rios*, 34 A D 2d 325.) Thus, she is relegated; as a losing wife, to the protection of section 236 of the Domestic Relations Law. (*Brownstein* v. *Brownstein, supra.*)

Accordingly, the judgment appealed from should be modified on the law and the facts, so as to reverse said judgment insofar as it awards a divorce to defendant husband on the grounds of plaintiff wife's alleged abandonment of him, and defendant's counterclaim seeking a divorce or alternatively a separation should be dismissed on the merits; and the first, second, third, fourth and fifth decretal paragraphs of the judgment appealed from should be stricken; and insofar as the judgment dismissed the plaintiff's first, second, third and fourth causes of action, judgment should be affirmed, and the matter remanded to Trial Term for a determination by a Justice, other than the one who tried the main case, of the question of suitable support for the wife and children as justice requires; and except as so modified, the judgment should be affirmed, without costs and without disbursements. Settle order.

MARKEWICH, J. (concurring in result). I concur in the result arrived at in Justice McGIVERN's opinion: dismissal of complaint and counterclaim for insufficiency of proof, and provision for support of plaintiff wife and the children of the marriage. However, I find no justification in the record for the statement that the Trial Justice arrived at a conclusion of divorce for the husband on the ground of abandonment by " an indiscriminate application of the ' dead marriage ' theory ". This is accompanied by a discussion distinguishing this case from *Gleason* v. *Gleason* (26 N Y 2d 28). As the majority opinion recognizes, this case is founded, both in complaint and counterclaims, on allegations by each party of the fault of the other; the judgment is on a finding of fault; the parties did not present it as anything other than a " fault " case — indeed, from what appears in the record, they could not; in short, they pleaded and tried a clear-cut " fault " case, albeit both unsuccessfully; and the excerpted statement of the Trial Justice runs counter to any idea that the judgment had any basis in " dead marriage." That theory is dragged in by the heels, and nothing in the record supports it, or a discussion of it. Parenthetically, I find the same difficulty with Justice KUPFERMAN's attempt to

justify the judgment of divorce, basing it on the idea of "dead marriage."

In short, what I see here is simply that each party has failed to establish the fault of the other. There is no point in attempting to distinguish this case from *Gleason,* to which it bears no resemblance, or, on the other hand, to award a divorce as a sort of equitable compromise in a case that does not call for it. Our duty is to "grant the judgment which the court below ought to have granted." (*Society of N. Y. Hosp.* v. *Burstein,* 22 A D 2d 768; CPLR 5522). To this end, I concur in the result.

KUPFERMAN, J. (dissenting in part and concurring in part). The opinion aptly states the background, but the good humor of it cannot remove the shroud from the tomb to which the parties have long since consecrated their wedded bliss. The trial court indeed determined that the marriage was dead, and reading the account of the low esteem which the parties have for one another and the peregrinations leading to that defunct status, it is obvious that the miracle of resurrection will not make quick that which has departed, late or soon.

As Chief Judge FULD stated in the now renowned case of *Gleason* v. *Gleason* (26 N Y 2d 28, 39 [1970]): "implicit in the statutory scheme is the recognition that it is socially and morally undesirable to compel a couple whose marriage is dead to remain subject to its bonds." (See, also, the dissent of MARKEWICH, J. in *Rios* v. *Rios,* 34 A D 2d 325, 328 [1st Dept., June 18, 1970]; *Berczeller* v. *Berczeller,* N. Y. L. J., Oct. 27, 1970, p. 20, col. 3 [Sup. Ct., N. Y. County].)

We should be applying the majesty of the Domestic Relations Law to this cadaver to see if we can arrange for a mausoleum and a legally decent interment.

The trial court, acting as a labor arbitrator rather than a coroner, chose the route of lockout (where a general strike might have been more appropriate) and found an abandonment by the wife. (Domestic Relations Law, § 170, subd. [2].) The problem with this approach is that it may deny the wife alimony because it establishes her misconduct without establishing his equal culpability. (Domestic Relations Law, § 236; cf. *Kall* v. *Kall,* 35 A D 2d 943 [1970].)

As Foster-Freed explain in their excellent volumes on "Law and the Family", it is now "merely a matter of money." (Divorce, Separation and Annulment, vol. 1, Cum. Supp., 1970, § 6:3-d, p. 33.) Alimony should not have been denied as a matter of law.

306

To try to put these two people together again like Humpty-Dumpty, is cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution.

CAPOZZOLI, J. P., and STEUER, J., concur with McGIVERN, J.; MARKEWICH, J., concurs in the result in an opinion; KUPFERMAN, J., dissents in part and concurs in part in an opinion.

Judgment, Supreme Court, New York County, entered on September 16, 1970, modified, on the law and the facts, so as to reverse said judgment insofar as it awards a divorce to defendant husband on the grounds of plaintiff wife's alleged abandonment of him, and defendant's counterclaim seeking a divorce or alternatively a separation is dismissed on the merits; and the first, second, third, fourth and fifth decretal paragraphs of the judgment appealed from are stricken; and insofar as the judgment dismissed the plaintiff's first, second, third and fourth causes of action, judgment is affirmed, and the matter is remanded to Trial Term for a determination by a Justice, other than the one who tried the main case, of the question of suitable support for the wife and children as justice requires; and except as so modified, the judgment is affirmed, without costs and without disbursements.

Settle order on notice.